* * * * * * * * * * *
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Glenn. The appealing party has shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission reverses the Opinion and Award of Deputy Commissioner Glenn and enters the following Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All the parties are properly before the North Carolina Industrial Commission and the North Carolina Industrial Commission has jurisdiction of the parties and of the subject *Page 2 
matter. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employment relationship existed between plaintiff and defendant-employer at all times relevant herein.
3. Defendant-employer had workers' compensation insurance with Crumb Forrester and Crawford Co. was acting as servicing agent at all relevant times herein.
4. The parties stipulate that the average weekly wage was $438.46 per week, resulting in a weekly compensation rate of $292.45 per week.
5. Employee was totally disabled from September 16, 2002 through November 27, 2002, when she returned to work with restrictions. On July 29, 2003, Employee was laid off due to the plant closing. The plant closed on July 30, 2003. Employee has been out of work continuously since July 29, 2003.
6. The parties tendered a pretrial agreement. At hearing the parties stipulated to the following:
 • Stipulated 1: Industrial Commission Forms (pp. 1-15)
 • Stipulated 2: Discovery (pp. 1-8)
 • Stipulated 3: Employer Wage Chart (p. 1)
 • Stipulated 4: Mediation Documents and Settlement Agreement (pp. 1-15)
 • Stipulated 5: Medical Records (pp. 1-73)
 • Stipulated 6: Medical Bills (pp. 1-34)
7. At oral argument before the Full Commission, the parties stipulated that N.C. Gen. Stat. § 97-42 allows a week by week credit for benefits that are not due and payable. Plaintiff received short term disability payments of $311.00, $89.00 and $68.00. Plaintiff received unemployment *Page 3 
from July 2003 until January 2004 at $314.00 per week, subject to verification. Plaintiff received further benefits provided by defendants to all employees who were laid off. The parties stipulated that if necessary, they will compute the week by week credit based upon the documentation if benefits are awarded by the Full Commission.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Employee was born on August 30, 1961, in Guatemala. She completed the 10th grade in Guatemala. She moved to the United States in July 1990, and lived in California until relocating to North Carolina in December 1996. Plaintiff received her GED in February 2005.
2. Employee began work with defendant in November 2000 as a machine operator on a spinning machine. The defendant closed the plant on July 30, 2003.
3. Plaintiff testified that on September 5, 2002, she leaned over a metal bar to pick up a bobbin that had fallen off a spool, and she felt pain in her back on her left side.
4. Plaintiff testified that she did not immediately report the incident to her supervisor Plaintiff indicated that she originally thought the back pain was related to constipation.
5. Plaintiff testified that the next day she told her supervisor, Helen, about the incident. Plaintiff's production was poor on her shift which began on Saturday, September 7, 2002, and ended Sunday, September 8, 2002. Plaintiff did not work on Monday, September 9, 2002, or Tuesday, September 10, On Wednesday, September 11, 2002, plaintiff's supervisor reprimanded her for her low production at work and told her to go to the doctor. *Page 4 
6. Plaintiff was seen by Kim Purcell, P.A., on Friday, September 13, 2002 with complaints of pain in her lower back for approximately two weeks, hip pain, urinary frequency and urinary hesitancy. PA Purcell's assessment was low back pain and urinary tract infection.
7. Plaintiff was seen in the Emergency Room at Rowan Regional Medical Center on Sunday, September 15, 2002, with complaints of back and leg pain and diagnosed with low back pain and acute sciatica.
8. On Tuesday, September 17, 2002, plaintiff returned to P.A. Purcell with continued complaints of low back pain on her left side that went down the back of her left leg into her heel. Plaintiff was given an out of work note for September 16, 2002, through September 23, 2002, and told to return if her symptoms did not improve.
9. On Friday, September 20, 2002, plaintiff returned to P.A. Purcell with complaints of increased back pain. On Monday, September 23, 2002, Employee returned to P.A. Purcell with continued complaints of pain in her back going down her leg and numbness and tingling, and she was sent for an MRI of her lumbar spine and continued out of work.
10. On Thursday, September 26, 2002, P.A. Purcell called plaintiff's supervisor Helen Garner and told her of the diagnosis and plan to see a neurosurgeon for her back pain on September 26, 2002.
11. Dr. Ranjan Roy first examined Employee on September 26, 2002, upon referral of Kim Purcell, P.A. After an MRI demonstrated a large left-sided disc herniation at L5-S1 with caudal migration of disc material into the neural foraminal opening, Dr. Roy recommended a microdiscectomy.
12. On October 3, 2002, Dr. Roy performed a left L5-S1 hemilaminotomy and discectomy for removal of free fragment. Dr. Roy gave her work restrictions of no lifting more *Page 5 
than 10-15 pounds and limit bending and twisting and allowed her to return to work on November 26, 2002, but plaintiff did not actually return to work due to the plant closing until December 2, 2002.
13. On November 18, 2002, plaintiff indicated to Dr. Roy for the first time that her problems "may" be work-related. Dr. Roy noted that plaintiff described the type of work the she was doing, and that the work may have led to the problem, but there is no description of the particular incident.
14. Plaintiff was out of work as a result of her back pain and subsequent surgery from September 16, 2002 until November 26, 2002. Plaintiff returned to work in her normal position on November 27, 2002
15. On December 2, 2002, plaintiff told Dr. Roy that she initially felt that her back pain was related to her constipation and urinary tract infection. Plaintiff also indicated to Dr. Roy that her heavy work load appeared to worsen the back pain.
15. Defendant-employer's plant closed on July 30, 2003 due to economic downturn. Thousands of employees were laid off as a result of the plant closing.
16. Plaintiff returned to Dr. Roy on July 30, 2003 with complaints of a pinching sensation in her lower back, and left leg and foot pain. Dr. Roy instructed plaintiff to take Aleve and to return as needed.
17. On April 23, 2004, Dr. Michael D. Getter, a board certified orthopaedic surgeon, examined plaintiff and diagnosed "failed back syndrome". Dr. Getter recommended medical pain management for her chronic pain.
18. Dr. Getter assigned a 10 percent permanent partial disability rating to plaintiff's back using the North Carolina Industrial Commission Rating Guidelines. Dr. Getter agreed with *Page 6 
the periods of disability as being reasonable and agreed with permanent work restrictions of no lifting over 10-20 pounds, limited bending, twisting and lifting.
19. On April 27, 2004, a mediation was held in this case. At the mediation plaintiff was represented by an attorney and a translator, Manuel Cruz. An agreement was reached at the mediation to settle the matter for $7,500.00, with plaintiff paying the unpaid medical bills and defendants paying the mediation costs. Plaintiff was to be advanced $1,500.00 upon execution of the settlement agreement.
20. Plaintiff now asserts that at the time of mediation she understood that she was to receive $7,500.00 per month for three months under the agreement and she would pay out of this money the unpaid medical bills in the amount of $600.00 and defendants would pay the mediation costs. When the clincher agreement was sent to plaintiff by her attorney, plaintiff refused to sign the agreement.
21. Plaintiff now asserts that a language barrier prohibited her from understanding the Mediated Settlement Agreement. Plaintiff testified that she thought at the time of the mediation that she understood the translator well, but testified that following the mediation, she understood that she would receive $7,500.00 per month for three months instead of a one-time payment as provided in the mediated settlement agreement. Plaintiff testified that she understood that that she would be advanced $1,500.00, and that defendants were to pay the mediation costs.
22. Dr. Roy testified that during his treatment of plaintiff, he felt that plaintiff was able to communicate effectively in English, and he did not have any difficulty understanding plaintiff when she explained her history to him. Dr. Roy felt comfortable enough with plaintiff's English skills to allow her to sign a consent form for surgery without a translator. In addition, plaintiff had been taking English classes as part of her GED since the fall of 2003. *Page 7 
23. At no time did plaintiff indicate to her attorney, the mediator or the translator that she was having any trouble understanding the translator. Plaintiff testified that she understood that a final agreement had been made, and that she could read the numbers on the mediated settlement agreement, as numbers are written in Spanish the same way that they are written in English.
24. The undersigned find as fact that plaintiff's testimony that she did not understand the settlement amount is not credible. At no time during the mediation process did plaintiff's counsel indicate to defendants that the terms of the Agreement were not acceptable to plaintiff. Defendants did not mislead or deceive plaintiff regarding the terms of the agreement.
25. The greater weight of the credible evidence shows that plaintiff was aware of the terms of the Agreement and signed the Agreement without fraud, misrepresentation, mutual mistake or undue influence.
25. The parties entered into a valid, enforceable contract following a meeting of the minds regarding the essential terms of the Agreement which were sufficiently definite and certain.
26. The Mediated Settlement Agreement was fair and reasonable at the time of mediation given the uncertain outcome at a potential hearing, particularly regarding the credibility of plaintiff's account of the incident.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following: *Page 8 
 CONCLUSIONS OF LAW
1. Compromise settlement agreements, including mediated settlement agreements, "are governed by general principles of contract law."Chappell v. Roth, 353 N.C. 690, 692, 548 S.E.2d 499, 500, reh'gdenied, 354 N.C. 75, 553 S.E.2d 36 (2001). "It is a well-settled principle of contract law that a valid contract exists only where there has been a meeting of the minds as to all essential terms of the agreement." Northington v. Michelotti, 121 N.C. App. 180, 184,464 S.E.2d 711, 714 (1995). "To be enforceable, the terms of a contract must be sufficiently definite and certain." Miller v. Rose,138 N.C. App. 582, 587-88, 532 S.E.2d 228, 232 (2000).
2. A Memorandum of Settlement that fully complies with Rule 502(2) of the Workers' Compensation Rules constitutes a valid compromise settlement agreement subject to approval by the Industrial Commission pursuant to Rule 502(1). Lemly v. Colvard Oil Company, 157 N.C. App. 99,577 S.E.2d 712 (2003).
3. The language of the Memorandum of Agreement clearly states that the parties agreed to settle plaintiff's claim for $7,500.00 and that defendants would pay for mediation costs. The Agreement also states that plaintiff "will execute a clincher agreement general release/other agreement, in consideration for the sum of $7,500.00, subject to an attorney's fee approved by the Industrial Commission" Defendants prepared a Clincher Agreement in accordance with the requirements of the Act; therefore, the agreement satisfies the requirements of Lemly.Id.
4. The Memorandum of Agreement fully complies with the requirements of the Act and constitutes a valid compromise settlement agreement subject to approval by the Industrial Commission. N.C. Gen. Stat. § 97-17. Having reviewed the Final Agreement, the undersigned find it to be fair and just to all parties and hereby APPROVES the agreement. *Page 9 
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Defendants shall pay plaintiff pursuant to the terms of the Mediated Settlement Agreement.
2. A reasonable attorney's fee of 25% of the amount paid pursuant to the Compromise Settlement Agreement is hereby approved to be deducted from sums due plaintiff and paid directly to plaintiff's counsel.
3. Each side shall pay its own costs.
This the 30th day of November, 2006.
 S/______________________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/______________________ DIANNE C. SELLERS COMMISSIONER
DISSENTING WITHOUT WRITTEN OPINION:
 S/______________________ THOMAS J. BOLCH COMMISSIONER *Page 1